Otal Investments, Ltd. v. M.V. Tricolor

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

_____

August Term, 2011

(Argued: November 2, 2009                    Decided: March 8, 2012)

Docket No. 08-3031-cv(L), 08-3032-cv(XAP) & 08-3324-cv(CON)

_____

OTAL INVESTMENTS LIMITED, as Owner of the M/V Kariba, for Exoneration from or Limitation of Liability,

      *Plaintiff-Counter Defendant-Third-Party-Plaintiff-Appellee-Cross-Appellant*,

M/V TRICOLOR, her engines, boilers, etc.,

      *Consolidated-Defendant-Appellee*,

N.V. FORTIS CORPORATE INSURANCE, UNITED SERVICES AUTOMOBILE ASSOCIATION, ASI AUTO SHIPMENT GmbH, CHARLES BROOMFIELD, MORGAN MOON, PATRICIA YORK, APLINA INSURANCE CO., TED L. RAUSCH CO., AUGUSTA ASSICURAZIONI S.p.A., CNH ITALIA S.p.A, CNH TRADE N.V., NEW HOLLAND  NORTH AMERICA INC., FEDEX TRADE NETWORKS TRANSPORT & BROKERAGE INC., O & K ORENSTEIN & KOPPEL A.G., CASE CORPORATION AND TOWER GROUP INTERNATIONAL, ZURICH INSURANCE CO., GERLING INSURANCE CO., as subrogee and/or assignee of Schempp-Hirth Flugzeug-Vertriebs GmBH, DAVID GREEN HILL, LIEBHERR-MISCHTECHNIK GmBH, LCT LIEBHERR CONCRETE TECHNOLOGIE, LIEBHERR-WERK NENZIG GmBH, LIEBHERR AMERICA INC., E.H. HARMS GmBH & CO.,  JOHN DEER WEREKE MANHEIM, LLOYD`S SYNDICATE NO. WTK 457, PJG 2724, CMA 839, MLM 1221, GOS 102, EUL 1243, WHS 2, AML 2001, MKL 300, COP 1036, TAL 1183, NLU 2323, and KLN 510, DEER & CO., TIMBERJACK AB HARVESTER PLANT, JOHN DEER CONSTRUCTION EQUIPMENT COMPANY, VOLVO CAR CORPORATION, VOLVO CARS OF NORTH AMERICA INC., ZURICH INTERNATIONAL (UK) LIMITED, CAN MARITIME, IF P & C INSURANCE LTD., FORSAKRINGSBOLAGET ZURICH-SCHWEIZISKT AKTIEBOLAG, NAVIGATORS INSURANCE COMPANY, EURO MACHINERY B.V. USED EQUIPMENT, SUPERIOR USED EQUIPMENT, AXA-UK, AXA-CANADA, WILCO MACHINERY B.V., FCI EQUIPMENT, TELCO B.V., AIS CONSTRUCTION MACHINERY, STEVENSON EQUIPMENT LTD., ARING EQUIPMENT COMPANY INC., KOMATSU UTILITY EUROPE S.p.A., KOMATSU AMERICA CORPORATION, as successor to Komatsu Utility Corporation and Komatsu America

International Company, THE TOKIO MARINE AND FIRE INSURANCE CO. LTD., NACCO MATERIALS HANDLING B.V., NACCO MATERIALS HANDLING GROUP, ROUNDO AB, ACE USA, SAMUEL SHAPIRO & COMPANY INC., SANDVIK SRP AB, AGGREGATE CRUSHER SPEC. LLC & NANSSON AGGREGATES, LANDINI S.p.A., LANDINI U.S.A. INC., FIREMAN`S FUND MCGEE, BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, BMW OF NORTH AMERICA LLC , HAFTPFLICHTVERBAND DER DEUTSCHEN INDUSTRIE VAG., XL WINTERTHUR INTERNATIONAL INSURANCE COMPANY LTD., AIG EUROPE, FRANKFORT, DBV WINTERTHUR VERSICHERUNGEN, GERLING ALLGEMEINE VERSICHERUNGS AG, SAAB AUTOMOBILE AB, SAAB DEUTSCHLAND GmBH, SAAB CARS USA INC., ALLIANZ MARINE & AVIATION VERSICHERUNGS AG, ZURICH GLOBAL ENERGY, AMERICAN INTERNATIONAL MARINE AGENCY,

     *Claimants-Appellees*,

     -v.-

M/V CLARY,

     *Third-Party-Defendant-Cross-Defendant-Appellant-Cross-Appellee*,

MINERAL SHIPPING CO., MST MINERALIEN SCHIFFAHRT SPEDITION UND TRANSPORT GmBH, CLARY SHIPPING PTE LTD.,

     *Third-Party-Defendants-Appellants-Cross-Appellees*,

ACTINOR CAR CARRIER I AS, CAPITAL BANK PUBLIC LIMITED COMPANY, WALLENIUS WILHELMSEN LINES AS, WILH. WILHELMSEN ASA,

     *Third-Party-Defendants-Counter Claimants-Appellants-Cross-Appellees*.

_____

Before: B.D. PARKER, HALL, and LYNCH, *Circuit Judges.*
_____

Appeal from the amended opinion and order of the United States District Court for the Southern District of New York (Baer, *J.*) allocating liability for a collision that led to the sinking of the M/V Tricolor in the English Channel. The owners of each of the three vessels involved in the collision have appealed that allocation. In addition, the owners of the M/V Clary contend

that they are entitled to limit their liability under the Limitation of Liability Act, and the manager of that vessel asserts that the district court erred in finding it liable for the collision under common law. For the reasons that follow, we AFFIRM the district court's allocation of liability, VACATE and REMAND the issue of whether the shipowners are entitled to limit their liability under the statute, and decline to address the manager's argument, as it was raised for the first time on appeal.

JOHN D. KIMBALL, Blank Rome LLP, New York, New York, *for Plaintiff-Counter-Defendant-Third-Party-Plaintiff-Appellee-Cross-Appellant*.

CHESTER D. HOOPER (James T. Shirley, Francesa Morris, *of counsel*) Holland & Knight, New York, New York, *for Third-Party-Defendants-Counter-Claimants-Appellants-Cross-Appellees*.

EDWARD J. POWERS, Vandeventer Black LLP, Norfolk, Virginia, *for Third-Party-Defendant-Cross-Defendant-Appellant-Cross-Appellee* and *Third-Party-Defendants-Appellants-Cross-Appellees*.

RAYMOND P. HAYDEN (Kipp C. Leland, *of counsel*) Hill Rivkins & Hayden, LLP, New York, New York, *for Claimants-Appellees*.

Nicholas Philip Giuliano, Bennett, Giuliano, McDonnell & Perrone, LLP, New York, New York,

Keith W. Heard, Burke & Parsons, New York, New York,

Alfred J. Will, Badiak & Will, Mineola, New York,

*for certain Claimants-Appellees*.

PER CURIAM:

3

Nine years ago, on a foggy night in the English Channel, three vessels—the M/V Kariba (the "Kariba"), the M/V Tricolor (the "Tricolor"), and the M/V Clary (the "Clary")—came into close proximity of one another. The Kariba altered course to avoid the Clary and, in doing so, struck the Tricolor, causing it to sink. Subsequently, the owners of the Kariba brought an action for exoneration or limitation of liability. The parties filed cross-claims, counter-claims, and third-party claims. After a bench trial in 2005, the district court (Baer, *J.*) held the Kariba 100% liable for the collision. *In re Otal Invs. Ltd.*, Nos. 03-civ-4304, 03-civ-9962, 04-civ-1107, 2006 WL 14512 (S.D.N.Y. Jan. 4, 2006) ("*Otal I*"). The owners of Kariba and the owners of the cargo on the Tricolor (the "Cargo Claimants") appealed. We reversed in part, holding that all three vessels had violated international regulations and were partially responsible for causing the collision, and remanded for the district court to consider the relative culpability of each vessel and the extent to which that culpability caused the collision. *Otal Invs. Ltd. v. M.V. Clary*, 494 F.3d 40, 63 (2d Cir. 2007) ("*Otal II*"). In its June 28, 2008 amended opinion and order, the district court allocated 63% liability to the Kariba, 20% liability to the Clary, and 17% liability to the Tricolor. *Otal Investments Ltd. v. M/V Clary*, No. 03-civ-4304, 03-civ-9962, 04-civ-1107, 2008 WL 2844019 (S.D.N.Y. June 23, 2008) ("*Otal III*"). Among other holdings, the district court did not permit the Clary's Owners to limit their liability under the Limitation of Liability Act. All of the ships' interests appealed, arguing that the district court erred in allocating liability. The Clary Owners also contend that the district court erred in denying its motion for limitation of liability, and the Clary manager claims that the district court erred by imposing liability upon it. We find no error in the district court's allocation of liability. However, we find clear error in the district court's determination that the Clary Owners were not entitled to limit

their liability.  We decline to address the Clary manager's argument that its liability is limited because that argument was not raised below.  We therefore AFFIRM in part, and VACATE and REMAND in part, for further proceedings consistent with this opinion.

## I.      Background

The facts surrounding the collision have been set forth in *Otal I* and *Otal II*, and it is not necessary to restate them here.  In *Otal III,* the district court made additional findings applicable to the issues framed on remand.  We will reference those facts only as necessary to explain our reasoning.

## II.     Allocation of Liability

### A.      Standard of Review

The Supreme Court has articulated a standard for allocation of liability involving the collision of vessels.  In *United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975), the Court held:

> when two or more parties have contributed by their fault to cause property damage in a maritime collision . . . , liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault.

*Id.* at 411.  Subsequently, in *Getty Oil Co. (Eastern Operations) v. SS Ponce De Leon*, 555 F.2d 328 (2d Cir. 1977), this Court determined that allocation of liability under *Reliable Transfer Co.* is a question of fact and therefore reviewable only for clear error.  *Id.* at 334; *see also Ching Sheng Fishery Co. v. United States*, 124 F.3d 152, 157-58 (2d Cir. 1997) ("A district court's . . . allocation of fault among negligent parties continues to be subject only to clearly erroneous review, and so long as the district court's factual findings are supported by the record, we will

5

not overturn them . . . ." (citation omitted)).  "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).  "On the comparative fault inquiry, . . . [the district court] has considerable discretion in determining the relative degrees of each party's fault[.]"  *Arabian Am. Oil Co. v. Hellenic Lines, Ltd.*, 633 F. Supp. 659, 670 (S.D.N.Y. 1986) (considering "all the facts and circumstances of this case," allocating fault "in the interests of justice," and noting that "damages, when ascertained, shall be apportioned accordingly"); *see also Elenson v. SS Fortaleza,* No. 90 Civ. 437, 1991 WL 254571, at *11 (S.D.N.Y. Nov. 21, 1991) (observing that a district court has "considerable discretion in determining the relative degrees of each party's fault in contributing to the collision").

### B.  Analysis

In our opinion remanding this case, we directed the district court

> to consider the relative culpability of each vessel and the relative extent to which the culpability of each caused the collision.  In making the culpability comparison, the district court should include in its consideration of the fault of the Clary the fact that its logbook was altered.  We hasten to add, however, that allocation of liability for damages, requiring consideration of matters not readily amenable to precise analysis, does not oblige an admiralty judge to do more than provide ultimate percentages of allocation, accompanied only by sufficient explanation to provide a reviewing court with some general understanding of the basis for the decision.

*Otal II,* 494 F.3d at 63.

The district court followed this directive.  It first focused on culpability, or "'how extensively each ship departed from a proper standard of care,' *i.e.*, here, the standard of care as

6

set forth in the COLREGS," and analyzed the COLREG[1] violations of each vessel. *Otal III,* 2008 WL 2844019, at *4 (quoting *Otal II*, 494 F.3d at 62). The district court began by allocating 33 1/3% culpability each to the Kariba, the Tricolor, and the Clary, finding that each vessel "made two acts or omissions that violated the COLREGS," *id.* at *11—a reasonable starting point in its allocation analysis. The court then factored in the relative seriousness of the COLREG violations, finding in this regard that the Kariba's infractions were the most egregious. The evidence, which shows, among other things, that the Kariba made an abrupt turn directly into the Tricolor rather than slowing its speed, amply supports this conclusion. *See Elenson,* 1991 WL 254571, at *11 (analyzing number and seriousness of each vessel's COLREG violations to determine relative culpability). The district court also enhanced the Clary's culpability, based on the alteration of its logbook, and determined that the Kariba was 40% culpable for the collision, the Clary was 36% culpable, and the Tricolor was 24% culpable. *Otal III*, 2008 WL 2844019, at *11-12.

The district court then examined the issue of causation, or "'the extent to which each ship's culpable conduct contributed to causing the collision.'" *Otal III*, 2008 WL 2844019, at *4 (quoting *Otal II*, 494 F.3d at 62). The district court assigned the highest percentage of liability to the Kariba because its "culpable acts caused the collision to a far greater extent than did the Tricolor's and the Clary's." *Id.* at *13. The Tricolor, however, was at greater fault than the Clary because its "unsafe speed and overtaking put it in such close proximity with the Kariba that the collision was certain to occur once the Kariba made its abrupt turn." *Id.* The district

---

[1] COLREGS are the navigational duties of a vessel, originally contained in The International Regulations for Preventing Collisions at Sea, Oct. 20, 1972, 28 U.S.T. 3459, and now codified by Congress at 33 U.S.C. § 1602 *et seq. See Otal II*, 494 F.3d at 49.

7

court found the Clary's "omissions were less causative than the Tricolor's commissions because it was farther away, and its failures therefore had less of a direct impact." *Id.* The court assessed the vessels' relative causation as follows: Kariba–86%; Tricolor–10%; Clary–4%. *Id.*

In order to reach the ultimate allocation of liability, the district court "considered culpability and causation as equally determinative and computed the average of each vessel's culpability and causation percentages." *Id.* The court's final allocation of liability for the collision was: Kariba–63%; Clary–20%; and Tricolor–17%. *Id.*

All three of the vessel parties have appealed either the liability formula, the allocation percentages, or both. We find nothing amiss with the district court's carefully considered and thoroughly explained formula or its allocation percentages. The district court followed this Court's directive on remand to assess the relative culpability and relative causative impact of each vessel, then merged the two numbers. We vested the district court with broad latitude to fashion a reasonable allocation among the parties. The district court provided "sufficient explanation to provide a reviewing court with some general understanding of the basis for the decision." *Otal II*, 494 F.3d at 63 (citing *Seiriki Kisen Kaisha*, 629 F. Supp. at 1382). Accordingly, we find no clear error in the district court's ultimate allocation of liability among the vessel parties.

III. **Clary Owners' Request for Limitation of Liability**

The Clary Owners maintain that the district court erred in denying them a limitation of liability under the Limitation of Liability Act because the record did not show that they were aware that the Clary sometimes operated without a lookout. The Cargo Claimants counter that

the Clary Owners made no attempt to satisfy their burden under the Limitation of Liability Act, and that the record supports the district court's factual determination.

The Limitation of Liability Act provides:

(a) In general. . . . [T]he liability of the owner of a vessel for any claim, debt, or liability described in subsection (b) shall not exceed the value of the vessel and pending freight. . . .

(b) Claims subject to limitation. Unless otherwise excluded by law, claims, debts, and liabilities subject to limitation under subsection (a) are those arising from any embezzlement, loss, or destruction of any property, goods, or merchandise shipped or put on board the vessel, any loss, damage, or injury by collision, or any act, matter, or thing, loss, damage or forfeiture, done, occasioned, or incurred, *without the privity or knowledge of the owner*.

46 U.S.C. § 30505 (emphasis added). Thus, "[i]nstead of being vicariously liable for the full extent of any [damages] caused by the negligence of the captain or crew employed to operate the ship, the owner's liability is limited to the value of the ship unless the owner himself had 'privity or knowledge' of the negligent acts." *In re City of N.Y.*, 522 F.3d 279, 283 (2d Cir. 2008).

Whether a vessel owner is entitled to limit its liability requires a two-step analysis. "'First, the court must determine what acts of negligence . . . caused the accident. Second, the court must determine whether the ship owner had knowledge or privity of those same acts of negligence . . . .'" *In re Moran Towing Corp.*, 166 F. Supp. 2d 773, 775 (E.D.N.Y. 2001) (quoting *In re Keys Jet Ski, Inc.*, 893 F. 2d 1225, 1230 (11th Cir. 1990)). The cargo claimant "bears the initial burden of proving negligence," after which the burden shifts to the shipowner to prove lack of knowledge or privity. *Id.* Both privity and knowledge "turn[ ] on the facts of particular cases." *Coryell v. Phipps*, 317 U.S. 406, 411 (1943); *see also In re Complaint of Messina*, 574 F.3d 119, 125 (2d Cir. 2009) (stating that the determination of whether acts of

9

negligence are within the knowledge or privity of the owner "is a fact specific undertaking" (internal quotation marks omitted)).

"'Privity or knowledge' can be actual or constructive. Either way, the term usually implies some degree of culpable participation or neglected duty on the shipowner's part; that, for example, it committed a negligent act . . . or through the exercise of reasonable diligence could have prevented the commission of the act . . . ." *Carr v. PMS Fishing Corp.*, 191 F.3d 1, 4 (1st Cir. 1999) (internal citation omitted). Where the shipowner is a corporation, privity and knowledge means "privity and knowledge by a managing agent, officer, or supervising employee of a ship." *Otal III*, 2008 WL 2844019, at *15. But the captain's negligence or navigational errors are not within the owner's knowledge or privity if the vessel's owner has selected a competent captain. *Id.* In this case, negligence has already been proven. The limitation of liability determination turns on whether the Clary Owners have proved lack of knowledge or privity with respect to the acts of negligence leading to the collision—specifically, whether they knew that the Clary failed to keep a proper lookout.[2]

In addressing the Clary Owners' limitation of liability argument, the district court cited trial testimony of the Clary's Second Officer Toncic "that the standard practice on the ships operated by Mineralien [Clary's manager of the vessel] was for lookouts to work all day and then be put on standby for call up to the bridge if there was trouble." *Id.* at *16. The court found that Toncic's testimony established that the Clary "did not always have a person on watch from 12 a.m. to 4 a.m." but, if someone was needed, Toncic knew "who should be called on the

---

[2] The Cargo Claimants do not argue that the Clary Owners knew that the Clary failed to take avoiding action promptly, the Clary's other COLREG violation.

10

bridge. They were not always on the bridge." *Id.* Without a citation to the record, the court then stated that "If a lookout worked at night, he would be paid overtime." *Id.* at *16. That sentence was immediately followed by a reference to the Cargo Claimants' argument that "the Clary's shoreside owners would have been aware of whether overtime was being logged and paid for lookout duty on a regular nightly basis." *Id.* The district court went on to state:

> The Cargo Claimants further note that instead of supervising the Clary's officers to ensure that they posted lookouts as required, the master was asleep in his room at the time of the collision. Trial Tr. 434. The Clary did not bring the master of the Clary to trial to testify in support of the request for limitation of liability.
>
> Therefore, this Court agrees with the Cargo Claimants that the Clary's owners were in privity with and had knowledge of the fact that the Clary at least sometimes failed to keep a proper lookout during the night.

*Id.* The court briefly discussed the Clary's COLREG violations, and concluded that even though the vessel had mandatory operating procedures that required lookouts to be posted in restricted visibility, "the Cargo Claimants have shown that the Clary's owners should have known that the Clary sometimes failed to keep a proper lookout." *Id.* The court held that the Clary Owners could not limit their liability under the Limitation of Liability Act. *Id.* at *17.

The only factual finding made by the district court to support its conclusion that the Clary Owners had "privity or knowledge" of the Clary's failure to keep a proper lookout was its statement that "[i]f a lookout worked at night, he would be paid overtime." *Id.* at *16. The court then adopted the Cargo Claimant's *argument* that the Clary Owners would have known if lookouts had actually been posted by reviewing the books that would have shown that overtime had been paid.

The record in this regard does not support the district court's factual finding. The only reference in the trial transcript to possible overtime for seamen on the Clary occurred during

11

Toncic's testimony, when he attempted to distinguish between the duties of Able-Bodied

Seamen and Ordinary Seamen.  The Clary Owners and Cargo Claimants each quote selected

snippets of that testimony in their briefs.  In order to understand the gist of what Toncic said, we

set forth his testimony at length:

Q (Attorney):          You testified that there are three ABs [Able Bodied Seamen] and, I
                       believe, two ordinary seamen on your ship?

A (Toncic):            Yes.

Q:                     Their[3] normal duties are day workers?

A:                     Day workers at sea, doing the watches in port, and they can do watches at
                       sea, if required.

THE COURT:             Each is assigned to a shift? I mean, does one have the 12 to four and then
                       four to eight and next eight to 12.

THE WITNESS:           The ABs, they are assigned to the ships.  And ordinary seamens, they were
(Toncic)               working as a day man.  Sometimes, not sometimes. . . .   They are not
                       doing the watches, working as the day man, but if they are required, they
                       can be called to do watches.

THE COURT:             If they're looking out and – I'm just not clear what you're saying.  When
                       you say they're day men, what does that mean?

THE WITNESS:           That means they start in day, in the morning and they working all the day
                       up until the 5:00.  They're not doing the watches.

THE COURT:             They're not doing the watch?

THE WITNESS:           They are not doing the watch.

Q:                     Is it true that you do not ordinarily call them to stand lookout nor
                       helmsman during the night when you're at sea because you have to pay
                       overtime if they work the day after that?

---

[3] The use of the word "their" is unclear—whether the attorney meant ABs *and* Ordinary Seamen, or simply Ordinary Seamen.  This confusion is clarified later: only Ordinary Seamen are day workers.

12

A:        Can you say again, please?

Q:        Yes.  Is it true that you don't ordinarily call them up on the bridge during the night because if you do, they have to be paid overtime on their day watch?

A:        No.  They don't have to be paid overtime.  I think that was all include in the contract, some overtime hours.

Q:        Can you explain that?

A:        Yeah.  The day, the contract says they have eight hours.  It was only eight hours.  Normal work eight hours, which most on the ship is 24 hours.  So they can be called for some overtime without any problem.

Q:        You can call them for overtime without any problem?

A:        Yeah, we can call them for overtime.  This is not a problem.

Q:        And is that standard on all the ships operated by Mineralien?

A:        Say it again.

Q:        Is that standard practice on all the ships that you sailed on for the same managers?

A:        If it's still the practice, what, to call them –

Q:        To have them work all day and then just put them on standby for call up if you run into trouble.

A:        They are doing as the day man when they are required, they, they were in watches.  So it's not that they are there all the time.

          * * *

THE COURT:   Let me get this day worker clear, since I wish I had that opportunity 50 years ago.  Are you saying that these people, they work a regular nine to five or eight-to-five day and then there is no assigned person to look out from eight to 12 at night or midnight to 4 a.m. every single night?  Is that true?

13

THE WITNESS:     We have to work in, those two seamen and three ABs and the ordinary seamans, they are day master, working starting in the morning and finishing in the evening.

THE COURT:       And they go to sleep?

THE WITNESS:     Yes. And three ABs, they are assigned to the watches. Each one in the line officers, one AB is assigned to the, to the ship mate's watch, another is with the second officer, the third is with the third officer.

THE COURT:       So there's always one on watch 12 to four?

THE WITNESS:     No, but if we need it, we know who should be called on the bridge. They were not always on the bridge.

THE COURT:       There are times when there's no able body who is looking out at the bow?

THE WITNESS:     There is sometimes, yes.

* * *

THE COURT:       I'm sorry to keep bringing this up. It sort of brings back old times. Is there no rule that requires an ordinary to do watches? In other words, it's really basically a day worker occupation, these days? Do you understand what I mean? In other words, the ordinaries as a regular course of business, throughout the shipping business, do not have assigned watches that they must be available for, like the 12 to four or four to eight?

THE WITNESS:     ABs, yes but ordinary–

THE COURT:       No, no, ordinaries. That's where I came in.

THE WITNESS:     No. I mean we can call them if we really need them.

THE COURT:       No. I got that part. But basically throughout the industry, they go to bed at 5:00, they eat dinner and –

THE WITNESS:     Five, 6:00. In the special circumstances, we can call them, like if it's required by the master, or if the special occasions considering the traffic or the weather, they can be called. But usually there is during the night one watch, one lookout with the officer, at the open sea and this one is the AB. And in the port and during the, approaching the port wherever the pilot is or in the port, there is a difference.

14

Despite Toncic's obvious problems in understanding and expressing himself in English, his descriptions of the respective duties of Ordinary Seamen and Able-Bodied Seamen and of the Clary's overtime pay practices are clear enough for our purposes. In essence, Toncic described a work scenario in which the two Ordinary Seamen assigned to the Clary would work an eight hour day shift. They would perform watches when the vessel approached port or while it was in port, and they could be asked to perform a watch while the vessel was at sea, if needed. Ordinary Seamen did not have to be paid overtime if they were occasionally asked to perform a watch at sea because their contract allowed them to work some overtime hours, without requiring additional payment. On the other hand, the three Able-Bodied Seamen on the vessel were not considered "day workers." They were assigned to watches at sea as a matter of course, although they did not always physically appear on duty. Nothing in Toncic's testimony suggested that Able Bodied Seamen were paid overtime while on watch: because such watches constituted an assigned duty, and because Able-Bodied Seamen were not limited to an eight-hour workday, it can be inferred they would not be paid overtime for watch duty.

Thus, Toncic's testimony indicates that only Ordinary Seamen could be paid overtime, but they were not; and there was no testimony that Able-Bodied Seamen were paid overtime. We do not find support in the record for the district court's finding of fact that all "lookouts" were paid overtime (regardless of *which* type of seaman they were), and thus that finding is clearly erroneous and must be set aside. *See Canizzo v. Farrell Lines, Inc.,* 579 F.2d 682, 686 (2d Cir. 1978) ("Where no substantial evidence supports a factual determination, it is clearly erroneous, and properly set aside.").

15

This error is significant. The thrust of the Cargo Claimants' argument, which found favor with the district court, was that the Clary Owners could have known that the Clary "was not posting lookouts had they consulted the overtime records, because A.B.s (Able Bodied Seamen) who stand watch would have been paid overtime." From that fact, the Cargo Claimants argue the following: because the Able-Bodied Seamen were not being paid overtime, the Clary Owners could have discovered that fact and therefore the Owners had the requisite "knowledge," cognizable under the Limitation of Liability Act of the Clary's negligence, *i.e.*, that neither on previous nights nor on the night of the collision were Able-Bodied Seamen standing watch.

Without a factual connection to overtime payments or lack thereof, nothing in the district court's analysis of limitation of liability demonstrates that the Clary Owners had the requisite knowledge that lookouts were not being posted. The district court mentioned that the master was asleep in his room at the time of the collision instead of supervising the vessel's officers to ensure that lookouts were properly posted. The Cargo Claimants, however, do not rely on this fact to argue that the Clary Owners could or should have known what had occurred—particularly since the district court appeared to accept the Clary Owners' argument that they had "selected a competent master and had no knowledge of any pattern of navigational errors by him." *Otal III*, 2008 WL 2844019, at *15.

The question then becomes whether the district court's clear error is sufficient for us to reverse the judgment and direct that a judgment be entered holding the Clary Owners not liable under the Limitation of Liability Act. We hold that there are insufficient facts for us to make such a determination. The district court accepted the Cargo Claimants' erroneous argument from the lack of overtime records about what the Clary Owners should have known about the

16

negligent failure to post lookouts, rather than addressing what the Clary Owners had proved that they did not know about that negligence. As a result, the court never made a specific finding about whether (putting aside the erroneous argument based on overtime) the Clary Owners had met their burden under the statute that they were without knowledge of the negligence that contributed to the collision. As the record evidence does not compel a conclusion either way about that question, it is for the district court as factfinder, and not for us, to make that finding.

The Clary Owners insist that they satisfied their burden proving lack of privity or knowledge because the trial testimony of two witnesses and numerous documents showed that they employed a competent crew and the Clary's watch officer was, as the district court found, "properly educated and trained and was fully qualified and competent." *Id.* They tout their mandatory operating procedures (requiring lookouts to be posted), weekly management team meetings, audits, restricted visibility checklists and other safeguards as proof that they satisfied their burden. Given that conflicting inferences can be drawn from the evidence of certain actions taken by the Clary Owners, coupled with the absence of evidence about whether those actions were adequately followed up, it is for the finder of fact to decide what inferences should be drawn from that state of the evidence about the Clary Owners' knowledge. Accordingly, we must remand for the district court to make a specific factual determination of the issue, but free of the error that infected its previous conclusion. That determination shall be based on and limited to a review of the existing record.

17

**IV.    Clary Manager's Request for Relief from Liability**

The Clary interests also argue that the vessel manager, MST Mineralien Schiffahrt Spedition und Transport GmbH ("MST"), should not be held liable because the district court made no independent findings either that MST was an alter-ego of the owner or that MST exhibited independent negligence, as required under *Quinn v. Southgate Nelson Corp.*, 121 F.2d 190 (2d Cir. 1941) and *Romero v. Garcia & Diaz, Inc.*, 286 F.2d 347 (2d Cir. 1961).  The Clary interests argue that the district court merely "classified both the Owners and the vessel managers as one" and the acts of negligence found by the lower court were linked to the responsibility of the owners, not the managers.

The Clary interests did not raise this argument in the district court, and we decline to consider it in light of the well-established general rule that a court of appeals will not consider an issue raised for the first time on appeal.  *See Singleton v. Wulff*, 428 U.S. 106, 120-21 (1976); *see also Virgilio v. City of N.Y.*, 407 F.3d 105, 116 (2d Cir. 2005).

## CONCLUSION

We AFFIRM the district court's allocation of liability among the three vessels, and VACATE and REMAND to the district court the issue of the Clary Owners' limitation of liability.