# In the
# United States Court of Appeals
## For the Second Circuit

_____

August Term 2019

No. 19-3769-cv

MICHAEL P. KEARNS, IN HIS INDIVIDUAL CAPACITY AND OFFICIAL CAPACITY AS THE CLERK OF THE COUNTY OF ERIE, NEW YORK,

*Plaintiff-Appellant,*

v.

ANDREW M. CUOMO, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF NEW YORK, LETITIA JAMES, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF NEW YORK, MARK J.F. SCHROEDER, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE NEW YORK STATE DEPARTMENT OF MOTOR VEHICLES,

*Defendants-Appellees,*

NEW YORK STATE CONSERVATIVE PARTY,

*Defendant.*

_____

Appeal from the United States District Court
for the Western District of New York
No. 19-cv-902,
Elizabeth A. Wolford, District Judge, Presiding.
(Argued: May 13, 2020; Decided: November 30, 2020)

Before:        PARKER, CHIN, and CARNEY, *Circuit Judges*.

Plaintiff-Appellant Michael P. Kearns, the Clerk of Erie County, New York, sued Governor Andrew Cuomo, Attorney General Letitia James, and Department of Motor Vehicle Commissioner Mark J.F. Schroeder, alleging that he could be prosecuted under federal immigration law for performing certain duties under New York's Driver's License Access and Privacy Act. The United States District Court for the Western District of New York (Wolford, *J.*) dismissed the suit for lack of Article III standing, holding that Kearns had failed to plead either a credible threat of prosecution for complying with the state law or an injury to his office. Because compliance with the state law would not expose Kearns to a credible threat of prosecution under federal law, the judgment of the District Court is **AFFIRMED**.

> KENNETH R. KIRBY, *for* Michael A. Siragusa, Erie County Attorney, Buffalo, NY, *for Plaintiff-Appellant*.
>
> LINDA FANG, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Jeffrey W. Lang, Deputy Solicitor General, *on the brief*), *for* Letitia James, Attorney General of the State of New York, New York, NY, *for Defendants-Appellees*.

BARRINGTON D. PARKER, *Circuit Judge*:

Plaintiff-Appellant Michael P. Kearns appeals from a judgment of the

United States District Court for the Western District of New York (Wolford, *J.*)

dismissing his complaint for lack of Article III standing. *See generally* Fed. R. Civ.

P. 12(b)(1). Kearns is the Clerk of Erie County, New York. He sued on federal

preemption grounds to challenge certain of his duties under state law related to processing applications for driver's licenses. The District Court concluded that Kearns suffered no concrete, particularized injury because he did not face a credible threat of prosecution under federal law if he complied with the provisions of the state statute that he challenged. It further held that Kearns failed to plead an injury to his office and that he was not a proper plaintiff to litigate the claims he raised. Because we agree that Kearns lacks standing, we **AFFIRM** the judgment of the District Court. The District Court did not reach the merits of Kearns' claims; nor do we.

## BACKGROUND

Though the processing of driver's licenses is governed almost exclusively by state law, federal law also imposes certain requirements. In 2005, Congress passed the REAL ID Act, Pub. L. No. 109-13, §§ 201-02, 119 Stat. 302, 311 (2005) (codified at 49 U.S.C. § 30301 note). Among other provisions, the Act sets forth minimum requirements that state-issued driver's licenses and identification documents must meet if they are to confer all the privileges of REAL ID Act-compliant licenses, such as entering federal facilities or boarding federally regulated commercial aircraft. *Id.* §§ 201(3), 202(a)(1).

To issue a REAL ID Act-compliant license, a state must verify an applicant's "lawful status" with Department of Homeland Security databases and maintain copies of the applicant's proof of that status. *Id.* § 202(b)-(d). "Lawful status" includes citizens and lawful permanent residents, but also includes certain persons who may have entered the country without pre-authorization, such as those with deferred action status or pending asylum applications. *Id.* § 202(c)(2)(B); 6 C.F.R. § 37.3.

The REAL ID Act does not bar states from continuing to issue driver's licenses that do not comply with the Act. *See* REAL ID Act § 202(d)(11); 6 C.F.R. § 37.71(a). The Act requires states to maintain individuals' proofs of identity only when they apply for REAL ID Act-compliant licenses, *see* REAL ID Act § 202(d)(2), (11), and although the Act requires states to collect a social security number or proof of ineligibility from any applicant for a compliant license, it imposes no such requirement on applicants for noncompliant licenses. *See* REAL ID Act § 202(c)(1)(C), (d)(11). Notably, the REAL ID Act does not require states to verify the lawful status of applicants for noncompliant licenses. *See* REAL ID Act § 202(c)(2)(B), (d)(11).

Regardless of whether a putative applicant would be eligible for a REAL ID-Act compliant license, under New York law applicants may apply for what are known as "standard licenses." In June 2019, the New York legislature enacted the Driver's License Access and Privacy Act (the "Green Light Law") that establishes certain policies and procedures related to standard licenses. 2019 N.Y. Laws, Ch. 37. The Green Light Law directs the New York State Department of Motor Vehicles ("DMV") to accept various foreign documents as proof of identification and age for standard licenses, and prohibits DMV from inquiring about the immigration status of standard-license applicants. N.Y. Veh. & Traf. Law ("VTL") § 502(1), (8)). The law also provides that—in lieu of a social security number or proof of ineligibility—applicants for a standard license may submit an affidavit attesting that they have not been issued a social security number. *Id.* §§ 502(8)). Standard licenses are branded as "Not for Federal Purposes." *Id.*

The Green Light Law also restricts DMV's retention and use of certain applicant information (the "nondisclosure provisions"). For example, it prohibits DMV from retaining originals or copies of the documents used by a standard-license applicant to prove age or identity "except for a limited period necessary to ensure the validity and authenticity of such documents," (*Id.* §

5

502(8)(d)).[1] Except as required by federal law to renew or issue a federally compliant license, the Act prevents the DMV from disclosing an applicant's records or information to "any agency that primarily enforces immigration law or to any employee or agent of such agency" absent a lawful court order or judicial warrant. *Id.* § 201(12)(a). The Act also requires persons with access to DMV records to certify to the DMV commissioner that they will not make such disclosures. *Id.* § 201(12)(b)).

Finally, the Green Light Law requires that within three days of receiving a request for information or records from federal immigration authorities, DMV provide written notification to the subject of the request and inform the person of the identity of the requesting agency (the "notification provision"). *Id.* § 201(12)(a).

Though DMV oversees the licensing of drivers, it does not issue driver's licenses exclusively through its employees. In several upstate counties—including Erie—county clerks are responsible for issuing licenses. New York law

---

[1] The statute contemplates that DMV will typically conduct an automated verification of an identification document's authenticity and immediately return the document to the applicant. *See* N.Y. Assembly Debates on Bill A3675B, at 71-72 (June 12, 2019).

designates certain county clerks as agents of the DMV Commissioner and assigns them discrete functions in that regard. *See* VTL § 205(1).

As the Erie County Clerk, Kearns is an agent of the DMV Commissioner. State restrictions limit both Kearns' role in DMV affairs and his access to DMV records. In carrying out his ministerial duties, Kearns is bound by DMV rules, which address the handling of DMV records and the processing of third-party requests for DMV information. Under these rules, Kearns supervises the issuance of driver's licenses by members of his office but has no personal involvement in the processing of license applications.

For example, while Kearns is allowed access to DMV systems, this access is limited. Kearns may enter and retrieve information from those systems only on a transaction-by-transaction basis as required to perform DMV business. Further, DMV rules do not authorize county clerks like Kearns to accept subpoenas, court orders, or other legal documents requesting DMV records. Instead, only DMV's headquarters in Albany may do so.

In July 2019, Kearns, both individually and in his official capacity commenced this action in the Western District of New York challenging the licensing, nondisclosure, and notification provisions of the Green Light Law. He

named as defendants Governor Andrew Cuomo, Attorney General Letitia James, and DMV Commissioner Mark Schroeder, in their official capacities. He sought (1) a declaration that the Green Light Law is preempted by federal immigration law, (2) an injunction against implementation of the Law, and (3) an injunction preventing Cuomo and James from removing him from office for refusing to comply with the Law.

Shortly after suing, Kearns moved for a preliminary injunction. He alleged that he faced a credible threat of prosecution under the federal Immigration and Nationality Act ("INA") if he complied with the Green Light Law. His argument focused on three provisions of the INA. The first was 8 U.S.C. § 1324(a)(1)(A)(iii), which imposes criminal penalties on

> [a]ny person who . . . knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation.

Second, Kearns referred to 8 U.S.C. § 1644, which provides that "no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in

the United States." This provision, however, does not impose criminal or civil penalties. *See City of Chicago v. Barr*, 961 F.3d 882, 902 (7th Cir. 2020).

Third, Kearns invoked 8 U.S.C. § 1373, which imposes the same requirement as § 1644 and prevents states from limiting any government entity's ability to maintain information on an individual's immigration status. Like § 1644, § 1373 imposes no criminal or civil penalties.

In August 2019, Defendants-Appellees moved to dismiss the complaint under Rules 12(b)(1) and 12(b)(6) and opposed Kearns' motion for a preliminary injunction. Kearns later filed an amended complaint, but the Parties agreed that the amendment did not moot the outstanding motion to dismiss.

In November 2019, the District Court granted the motion to dismiss under Rule 12(b)(1) on the grounds that Kearns failed to adequately plead Article III standing. Regarding Kearns' challenge to the licensing provisions, the District Court found it dispositive that Kearns' role in the issuance of driver's licenses is purely ministerial and concluded that he failed to plausibly allege a scenario where he would have any personal interaction with a standard-license applicant so as to expose him to criminal liability.

Regarding the nondisclosure provisions, the District Court concluded that Kearns' claim to standing rested on "speculation about a series of implausible events." Special App'x at 25. It observed that while Kearns is allowed access to DMV systems, this access is restricted. The District Court noted that DMV rules do not authorize county clerks to accept subpoenas, court orders, or other legal documents requesting DMV records. The court concluded that Kearns would be subject to the nondisclosure provisions only in circumstances under which a person produced records suggesting he was in the country unlawfully, federal authorities requested those records from Kearns personally rather than from DMV's office in Albany, Kearns accepted the request despite lacking the authority to do so, Kearns gleaned from the face of the request that it pertained to a person present in the country unlawfully, and Kearns then refused to disclose the records to federal authorities. The District Court characterized this series of events as implausible and deemed Kearns' pleading insufficient to demonstrate a credible fear of prosecution supporting Article III standing.

Regarding the notification provision, the District Court concluded that Kearns "has not alleged a plausible scenario where he personally would be required to notify an individual about a record request received from

immigration officials," because "[a]gents of the [DMV] are not authorized by the Green Light Law to provide that notification." *Id.*

In sum, the District Court held that Kearns had failed to demonstrate a sufficiently concrete threat of criminal sanction or removal from office to demonstrate Article III standing.

This appeal followed. We review *de novo* the District Court's order granting a motion to dismiss for lack of Article III standing. *Carter v. HealthPort Techs. LLC*, 822 F.3d 47, 56 (2d Cir. 2016).

## DISCUSSION

### I.

Article III of the Constitution limits the subject-matter jurisdiction of the federal courts to "'Cases' and 'Controversies.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting U.S. Const. art. III, § 2). Constitutional standing doctrine, which derives from Article III, is designed "to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Id.* More precisely, it "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). The doctrine imposes three requirements: "The plaintiff must have (1)

suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547.[2] "The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet [these] requirements." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (quoting *Diamond v. Charles*, 476 U.S. 54, 62 (1986)).

Kearns premised his theory of standing on the threat that he would be prosecuted for violating the INA if he complied with the Green Light Law. In general, "a plaintiff has standing to make a preenforcement challenge 'when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative.'" *Hedges v. Obama*, 724 F.3d 170, 196 (2d Cir. 2013) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979)). A plaintiff need not demonstrate with certainty that he will be prosecuted under the statute to show injury, but he must demonstrate a fear that is both actual and well-founded. *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d

---

[2] The District Court stated that it applied an especially rigorous standing inquiry because it was asked to review the actions of another branch of government, citing *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997). Nothing in the record, however, suggests that the District Court's decision turned on the use of a heightened standard, and Kearns—who objects to the invocation of *Raines*—fails to identify any effect *Raines* had on the court's analysis.

376, 382 (2d Cir. 2000). We conclude that Kearns has not satisfied these requirements.

II.

Kearns contends that he could be prosecuted under 8 U.S.C. § 1324 for harboring, concealing, or shielding from detection aliens who entered or are present in the United States unlawfully if he performed the functions he believes are imposed on him by the Green Light Law. This hypothesized injury, however, is conjectural, not "actual or imminent." *See Spokeo*, 136 S. Ct. at 1548; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

Under the Green Light Law, Kearns' office is responsible for issuing standard licenses. The theory that issuing standard licenses constitutes criminal harboring is directly at odds with federal law that expressly permits the issuance of such licenses. The REAL ID Act permits states to issue noncompliant licenses provided that they meet certain requirements, which do not include the verification of lawful status. *See* REAL ID Act § 202(d)(11). Moreover, 6 C.F.R. § 37.71(a), promulgated by the Department of Homeland Security, permits states that issue REAL ID Act-compliant licenses also to issue licenses "that are not acceptable by Federal agencies for official purposes," provided they meet certain

requirements. In other words, the statute and rule expressly allow New York to issue standard licenses without verifying that an applicant is lawfully present in the United States.

New York implements this provision by accepting foreign proofs of identity before issuing standard licenses but then labeling those licenses "Not for Federal Purposes" It is implausible—indeed inconceivable--that Congress passed a law and the Department of Homeland Security promulgated a rule that, if complied with, would require county clerks such as Kearns to engage in illegal activity.

In the same vein, the REAL ID Act's definition of "lawful status" includes certain persons who may have entered the country without preauthorization, such as those with deferred action status or pending asylum applications. REAL ID Act § 202(c)(2)(B); 6 C.F.R. § 37.3. The REAL ID Act allows these individuals to receive licenses that may be used to enter federal buildings and to board commercial aircraft. Accordingly, Kearns' argument would require us to conclude that when Congress passed the REAL ID Act and authorized clerks to issue federally compliant licenses to certain undocumented immigrants, it

simultaneously authorized the Department of Justice to prosecute those clerks for doing just that.

The case law construing § 1324 supports our conclusion. "Harboring," within the meaning of the INA, is "conduct which is intended to facilitate an alien's remaining in the United States illegally and to prevent detection by the authorities of the alien's unlawful presence." *United States v. Vargas-Cordon*, 733 F.3d 366, 382 (2d Cir. 2013). Proof of a violation of § 1324 requires that a defendant "engage in conduct that is intended both to substantially help an unlawfully present alien remain in the United States—such as by providing him with shelter, money, or other material comfort—and also is intended to help prevent the detection of the alien by the authorities." *Id.* Examples of harboring include physical concealment, arranging sham marriage ceremonies, and assisting unlawfully present persons in obtaining employment, with knowledge or reckless disregard of their immigration status. *See United States v. Kim*, 193 F.3d 567, 574 (2d Cir. 1999). Examples also include attempts to alert undocumented immigrants to the physical approach of immigration authorities. *Vargas-Cordon*, 733 F.3d at 380.

But compliance with the Green Light Law does not require Kearns to do anything like this. Because standard licenses bear the words "Not For Federal Purposes" and, by federal statute and regulation, may be issued without verifying an individual's lawful presence in the United States, they could not be used, as Kearns apparently fears, to deceive federal immigration authorities.[3]

Moreover, assuming without deciding that a driver's license is a material comfort, there is no suggestion in the complaint that Kearns would issue any such license with the intention of preventing the applicant's detection by immigration authorities or police. Instead, Kearns would be acting in a purely ministerial capacity, performing a duty assigned to him by his employer.[4] As a result, he would not be subject to prosecution under § 1324.

---

[3] It is telling, for example, that the U.S. Citizenship and Immigration Service's Form I-9, which employers must use to verify their employees' eligibility to work, treats driver's licenses as acceptable proof of identity but not as proof of employment authorization (i.e., they do not establish lawful presence in the United States). *See* Form I-9, U.S. Citizenship & Immigration Servs., https://www.uscis.gov/i-9.

[4] Kearns makes numerous references to the *legislature's* intentions in enacting the Green Light Law, but it is only *Kearns'* intentions that would be relevant to a § 1324 prosecution. Kearns contends that he could face conspiracy liability for implementing the Green Light Law with awareness of the legislature's intentions. We find no support for the rule that public employees become coconspirators with legislative bodies by merely fulfilling their statutory responsibilities.

Section 1324 contains a *mens rea* requirement. It prohibits harboring only when a defendant knows or recklessly disregards the fact that an alien has come to, entered, or remained in the United States in violation of law. Kearns' complaint, however, fails to plead any facts that would support a plausible inference of knowledge or reckless disregard. Kearns does not, for example, allege that he himself has ever worked at the counter in his office where he might interact with applicants for standard licenses. He does not plead that he personally reviews records submitted by applicants or that such records mention the applicants' immigration status. As the District Court observed, Kearns "has failed to plausibly allege a scenario in which he personally would be on notice of a substantial risk that an individual was in the United States unlawfully." Special App'x at 20. Simply put, failure to verify immigration status is not harboring, especially when an individual possesses no affirmative obligation to verify such status. *DelRio-Mocci v. Connolly Props. Inc.*, 672 F.3d 241, 247-48 (3d Cir. 2012**).**

Faced with these substantial hurdles, Kearns falls back on the assertion that no lawfully present person would apply for a standard license if the person were eligible for a REAL ID Act-complaint license.

This assertion is plainly incorrect. There are a number of reasons a person lawfully present in this country might apply for a standard license. For example, a foreign student present on a visa would possess a foreign passport but not a U.S. passport and might choose to use the foreign passport in connection with his application. A person with a Global Entry card might not require an additional means of identification at airports and thus prefer not to meet the more onerous requirements of the application for a REAL ID Act-complaint license. A lawful resident who is ineligible for a social security number might find it easier to complete an affidavit attesting to his ineligibility than to request a formal letter of ineligibility from the Social Security Administration. In sum, there are abundant explanations for an individual's choice to obtain a standard license. Merely applying for a standard license does not put a clerk—particularly one who does not interact with applicants for licenses—on actual or constructive notice of the applicant's immigration status. Suffice it to say that Congress did not believe that applying for a standard license provided such notice because it expressly authorized the issuance of these licenses.

Moreover, the REAL ID Act of 2005 postdates the 1986 enactment of § 1324 by 19 years. *See* Pub L. No. 99-603, § 112, 100 Stat. 3359 (1986) (codified at 8 U.S.C.

§ 1324). We have little difficulty concluding that Congress must have believed that § 1324 did not impose the requirement that state officials verify the lawful presence of driver's license applicants; otherwise, the REAL ID Act would have been superfluous. Kearns does not plausibly allege that § 1324 imposes a duty to verify the lawful status of driver's license applicants and therefore lacks a credible fear of prosecution under the statute.

The anti-harboring provision of § 1324 has been on the books in its current form since 1986. *See id.* Kearns does not identify a single instance in the intervening period where a county clerk was prosecuted for issuing a driver's license without verifying an applicant's immigration status or for issuing a driver's license to an undocumented person. *Cf. Poe v. Ullman*, 367 U.S. 497, 508 (1961) (holding that the threat of criminal enforcement was wanting when Connecticut had chosen not to enforce a statute for many years). Kearns' inability to do so is telling. The government's unwillingness or inability to prosecute a single county clerk for not verifying an applicant's immigration status in the 34 years that § 1324 has prohibited harboring is a "reason to conclude that no such intent [to prosecute] exists." *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65,

19

71 (2d Cir. 2019); *see also Poe*, 367 U.S. at 508.[5] For these reasons we conclude that Kearns lacks standing to challenge the licensing provisions.

III.

Kearns also lacks standing to challenge the nondisclosure provisions of the Green Light Law. He argues that these provisions violate 8 U.S.C. §§ 1373 and 1644, which impose a variety of prohibitions on states' attempts to restrict the flow of information to federal immigration authorities. However, Kearns cannot allege a credible threat of prosecution under these provisions because, among other reasons, neither of them imposes any criminal or civil penalties and, consequently, he would have no stake in the outcome of a legal challenge. *See, e.g., Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1619 (2020) (requiring a concrete stake in the outcome of a lawsuit); *Babbitt*, 442 U.S. at 299 (explaining that a party lacks

---

[5] Citing to *Tweed*, Kearns argues that where a statute specifically proscribes conduct, standing doctrine does not place the burden on the plaintiff to show an intent by the government to enforce the law against him. Rather, "intent to enforce the law is 'presumed . . . in the absence of a disavowal by the government or another reason to conclude that no such intent exists.'" Appellant's Br. at 25 (quoting *Tweed*, 930 F.3d at 71). *Tweed,* however, does not assist Kearns. That case involved an airport's challenge to a law that explicitly prohibited the airport from extending its runway. There was no question that the conduct the airport sought to engage in was proscribed by the statute; it was the conduct the statute was enacted expressly to prohibit. *Tweed*, 930 F.3d at 69.

standing to raise a pre-enforcement challenge when prosecution under a statute is impossible).

Kearns also contends that complying with the nondisclosure provisions of the Green Light Law would expose him to prosecution under § 1324, again claiming that obeying state law would constitute harboring. This argument is unavailing. Kearns fails to allege any role he would, or could, play in the implementation of the nondisclosure provisions. Although New York law empowers Kearns to act as an agent of the DMV Commissioner in the issuance of driver's licenses, it does not allow him access to DMV records except for the purpose of issuing licenses. More pointedly, it does not permit him to respond to subpoenas or requests for information from federal authorities; only DMV's central office in Albany may do so. And Kearns does not allege that he performs any role in maintaining DMV records or conducting other DMV business. Because Kearns bears no responsibility for implementing the nondisclosure provisions, he lacks standing to challenge them.[6]

---

[6] Although the Green Light Law might require Kearns to certify that he will not disclose DMV records to federal immigration authorities and such a certification could constitute a modicum of responsibility for implementing the nondisclosure provisions, existing DMV policies do not permit Kearns to make such disclosures. *See* Joint App'x at 178 (DMV Policy on Requests for Information from External Entities). As a result, his certification would be of no moment. And

Although the Green Light Law prohibits Kearns' office from retaining proofs of identity for longer than necessary to determine their validity and authenticity, the failure to retain such documents does not threaten Kearns with prosecution. To hold otherwise would be to hold that county clerks may be prosecuted under § 1324 anytime their office fails to retain indefinitely documents used to establish applicants' identities. Nothing in the text or history of § 1324 suggests that it imposes any requirement regarding the maintenance of local government records.[7] Additionally, as with his claim regarding the licensing provisions, Kearns has failed to allege that in implementing the

---

again, Kearns fails to allege that he would sign such a certification with the requisite *mens rea*. Finally, Kearns has not alleged that anyone has asked him to sign such a certification.

[7] It is true that 8 U.S.C. § 1373 bars any person or agency from prohibiting or restricting local government entities from maintaining information regarding the immigration status of any individual. However, the provision does not impose civil or criminal penalties, and therefore, Kearns does not face a fear of prosecution under § 1373 for failing to maintain such information. Additionally, the provision's mandate is directed at those who prohibit the maintenance of information (e.g., state legislatures) rather than those who, in their ministerial role, fail to maintain such information pursuant to state policy (e.g., Kearns). Finally, § 1373 was enacted in 1996—ten years after § 1324—and is best read as prohibiting conduct that was not within § 1324's existing prohibition on harboring. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 642, 110 Stat. 3009 (codified at 8 U.S.C. § 1373). Although the REAL ID Act requires states to maintain copies of individuals' proofs of identity for various periods of time, REAL ID Act § 202(d)(2), this requirement does not apply to standard licenses, *id.* § 202(d)(11).

nondisclosure provisions he would possess the requisite *mens rea*: i.e., knowledge or reckless disregard of an individual's unlawful presence and an intent to shield him or her from detection. Consequently, he lacks standing to challenge the nondisclosure provisions.

Finally, Kearns lacks standing to challenge the notification provision because it does not apply to him. That provision requires "*the commissioner* [to] notify the individual about whom . . . information was requested [by federal immigration authorities]." Green Light Law § 2(12)(a) (emphasis added). No provision of New York law authorizes or requires Kearns to provide any such notification. Tellingly, he admits that "[he] is not personally responsible for issuing notifications." Appellant's Br. at 39. Kearns does not allege that he has ever received a request that triggered a § 201(12)(a) notification. He does not allege that any such request is forthcoming. And he does not allege that he expects to provide written notification to any standard license applicant under that provision. With no role to play in issuing notifications, Kearns could not be prosecuted for doing so. As with the licensing and nondisclosure provisions, Kearns lacks standing to challenge the notification provision.

IV.

Finally, Kearns claims that in addition to the risk of prosecution if he complies with the Green Light Law, he faces the risk of removal from office if he disobeys the law. Unlike the threat of prosecution, which conveys standing if it is not "imaginary or wholly speculative," *Hedges*, 724 F.3d at 196, the threat of removal from office is evaluated under *Clapper*'s more restrictive standard, requiring that a prospective injury be "certainly impending," 568 U.S. at 409, as opposed to "merely speculat[ive]," *id.* at 411.

The threat that Kearns will be removed from office is speculative. It is based solely on his assertion that "Governor Cuomo has publicly refused to assure County Clerks that he would not remove them from office if they decline to follow the Green Light Law." Joint App'x at 196 ¶ 18. New York law gives the governor wide executive authority over county clerks. *See* N.Y. Const. art. XIII, § 13(a). Nothing in New York law requires the governor to extend the assurances Kearns wants. Standing is not achieved because a governor has refused to assure a subordinate official that he will or will not take a particular action. As noted, Kearns does not face a credible threat of prosecution for compliance with the

Green Light Law. Disagreement with, or disobedience to, such a law does not create a justiciable case or controversy. *See Hollingsworth*, 570 U.S. at 704.

## V.

For largely the same reasons that he lacks standing in his individual capacity, Kearns lacks standing in his official capacity. Kearns claims that his office would be injured if he were prosecuted for harboring, but as explained above, Kearns does not face a credible threat of prosecution. Moreover, the Clerk's Office itself faces no threat of prosecution because § 1324 applies to "person[s]," not government entities. In *Return Mail, Inc. v. U.S. Postal Serv.*, the Court noted the "longstanding interpretive presumption that 'person' does not include the sovereign" or government agencies. 139 S. Ct. 1853, 1861-62 (2019). For these reasons, we conclude that Kearns lacks official-capacity standing.[8]

---

[8] Kearns raises on appeal an argument that was not presented to the District Court: that he has standing because complying with the Green Light Law would violate his oath of office, which requires him to uphold the Constitution of the United States. In accordance with our usual practice, we decline to address arguments not raised below. *See, e.g.*, *Otal Invs. Ltd. v. M/V CLARY*, 673 F.3d 108, 120 (2d Cir. 2012).

**CONCLUSION**

We have considered Kearns' remaining arguments and find them to be without merit. For the foregoing reasons, the judgment of the District Court is

**AFFIRMED.**